UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

10TALES, INC.,

                Plaintiff,

     v.

TIKTOK INC., et al.,

                Defendants.

Case No.  21-cv-03868-VKD

**ORDER CONSTRUING CLAIM
TERMS OF U.S. PATENT NO. 8,856,030**

      Plaintiff 10Tales, Inc. ("10Tales") sued defendants TikTok, Inc., TikTok Pte. Ltd., ByteDance Ltd. and ByteDance, Inc. (collectively "TikTok"), alleging infringement of claim 1 of U.S. Patent No. 8,856,030 ("the '030 patent"), titled "Method, System and Software for Associating Attributes within Digital Media Presentations."  Upon consent of the parties, this action was reassigned to this Court for all purposes, including trial.  28 U.S.C. § 636; Fed. R. Civ. P. 72; Dkt. Nos. 174, 175.

      The parties have fully briefed their disputes over the construction of terms in claim 1.  Dkt. Nos. 167, 177, 182, 185.  At the Court's request, the parties also submitted a complete electronic copy of the prosecution history for the '030 patent.  The Court held a tutorial on July 28, 2022 and a claim construction hearing on July 29, 2022.  Dkt. Nos. 189, 190, 193.  The Court subsequently granted in part TikTok's motion for leave to file a claim construction sur-reply.  Dkt. No. 196. The parties submitted their supplemental briefs accordingly.  Dkt. Nos. 199, 200.  Upon consideration of the arguments and evidence presented by the parties at the hearing and in their briefing, the Court now issues the following order regarding the construction of claim terms.

# I.      BACKGROUND

The '030 patent issued on October 7, 2014, and claims priority to a provisional application filed on April 7, 2003. *See* '030 patent, cover page.  The patent, which contains two claims (independent claim 1 and dependent claim 2), concerns technology for customizing or personalizing content based on user information and relates to a "method, system, and software . . . which allow for customizing and personalizing content based on a combination of a user's demographics, psychodemographics, cognitive states, emotional states, social placement and group interaction dynamics within an online community, and/or affinity for certain content elements (images, sounds, segments, graphics, video, text, dialog), self-provided narrating content, internal narrative traits preference topology, and expectation level and temporal spacing of assets within the narrative." *Id*. at 2:65-3:7.  Noting the "advent of the digital era" and "threat[s] [to] advertising," the '030 patent describes a need "to attract individuals to content that is personally more relevant and impactful for them and which may contain an advertising message (in the form of product placement), and have them receive that message in full, as opposed to skipping over all or a portion of the message." *Id*. at 1:52, 59, 2:3-7; *see also id*. at 1:58-61.  The patent further notes an additional need "to have the ability to understand the individual's likes and dislikes or current mood in order to adapt the message appropriately for the individual at the time that they are receiving [content]." *Id*. at 2:8-11.

The claimed invention purports to provide an enriched user experience and more powerful media for content creators, such as advertisers and artists, through content that has greater impact on users. *See* '030 patent at 3:63-4:14.  According to 10Tales, the '030 patent claims improvements over the state of the art by addressing how technology can be used to understand an individual's likes or dislikes or mood in order to more appropriately adapt content for the individual. *See* Dkt. No. 167 at 3.  Among the stated advantages of the claimed invention is that "it allows advertising to be inserted in subtle ways and presented in a context in which users may be able to fully engulf themselves into the lifestyle being positioned and portrayed by the brand," and users "are much more likely to be receptive to the message presented, and less likely to skip over or fast-forward through the content including the advertising." *Id*. at 4:3-7, 12-14.

The parties disagree on the construction of ten terms from claim 1 of the '030 patent.

Claim 1 of the '030 patent recites:

> 1. A system for associating user attributes with digital media asset attributes and creating a user specific composite digital media display, the system comprising:
>
> a) a server;
>
> b) a computer-readable storage medium operably connected;
>
> c) wherein the computer-readable storage medium contains one or more programming instructions for performing a method of associating user attributes with digital media asset attributes and creating a user specific composite digital media display, the method comprising:
>
> identifying a first set of digital media assets stored on the computer-readable storage medium,
>
> creating, from the first set of digital media assets, a first composite digital media display,
>
> presenting to the user via a display server, the first composite digital media display;
>
> retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes;
>
> selecting, based on the user attributes in the social network information, a second set of digital media assets, wherein the second set of digital media assets is associated with one or more user attributes found in the user social network information;
>
> monitoring the first composite digital media display for the presence of a trigger, wherein the trigger indicates a personalization opportunity in the first set of digital media assets;
>
> performing a rule based substitution of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets to create a user specific set of digital media assets;
>
> creating, from the user specific digital media assets, a user specific composite digital media display; and
>
> presenting to the user via the display server, the second composite digital media display.

'030 patent at 20:62-22:15.

10Tales argues that these terms either require no construction or should be construed as

3

1   10Tales proposes.  TikTok contends that seven of the ten disputed claim terms are indefinite, *see*

2   35 U.S.C. § 112 ¶ 2,[1] and that claim 1 fails to inform with reasonable certainty those skilled in the

3   art about the scope of the claimed invention.  As for the remaining three terms, TikTok argues that

4   each term should be limited to a "narrative."

5          In their claim construction briefing, the parties rely on the declarations of their respective

6   experts:  Dr. Aviel D. Rubin (10Tales) and Dr. Alan Bovik (TikTok).  *See* Dkt. Nos. 167-4, 185-3,

7   185-13.  The parties also refer to proceedings before the Patent Trial and Appeal Board ("PTAB")

8   concerning TikTok's petition for inter partes review ("IPR") of the '030 patent, including

9   statements made in those proceedings by TikTok's expert, Dr. Kevin Almeroth.  *See, e.g.,* Dkt.

10  Nos. 167-5, 167-7, 185-15.

11         Following the claim construction hearing, the Court permitted the parties to file

12  supplemental briefing on aspects of their dispute over the term "user social network information."

13  Dkt. No. 196.  The parties filed their respective supplemental briefs in September 2022.  *See* Dkt.

14  Nos. 199, 200.  TikTok subsequently provided notice of the PTAB's denial of TikTok's request

15  for rehearing in the IPR proceedings in December 2022.  Dkt. No. 203.

16  **II.     LEGAL STANDARD**

17         Claim construction is a question of law.  *Teva Pharmaceuticals, Inc. v. Sandoz, Inc.*, 574

18  U.S. 318, 325-327 (2015); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996).  "It

19  is a bedrock principle of patent law that the claims of a patent define the invention to which the

20  patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir.

21  2005) (en banc) (internal quotations and citation omitted).  "Proper claim construction requires an

22  examination of the claim language, the written description, and, if relevant, the prosecution

23  history." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).  "The

24  appropriate starting point, however, is always with the language of the asserted claim itself."  *Id.*

25  _____

26  [1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. 112-29, 125 Stat. 284, enacted in 2011,
    amended several parts of the Patent Act, including 35 U.S.C. § 112.  The application resulting in

27  the '030 patent was filed before the AIA took effect.  Although the nature of the amendments to
    § 112 is not material to the resolution of issues presented in the parties' claim construction briefs,

28  in this order, the Court cites to the pre-AIA version of 35 U.S.C. § 112 that was in effect when the
    '030 patent application was filed.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Claim terms "are generally given their ordinary and customary meaning," which is "the

2    meaning that the term would have to a person of ordinary skill in the art in question at the time of

3    the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at

4    1312, 1313 (internal quotations and citations omitted). Claims must be read in view of the patent

5    specification, which "is always highly relevant to the claim construction analysis" and "the single

6    best guide to the meaning of a disputed term." *Id*. at 1315 (internal quotations and citation

7    omitted). The aim of claim construction is to "capture the scope of the actual invention that is

8    disclosed, described, and patented." *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323

9    (Fed. Cir. 2015) (internal quotation and citation omitted); *accord Phillips*, 415 F.3d at 1316. The

10   written description, prosecution history and the claims themselves form the intrinsic record that

11   provides substantial guidance as to the meaning of particular claim terms. *Phillips*, 415 F.3d at

12   1313, 1315-17.

13   Courts may also rely on "extrinsic evidence, which 'consists of all evidence external to the

14   patent and prosecution history, including expert and inventor testimony, dictionaries, and learned

15   treatises.'" *Id*. at 1317 (quoting *Markman*, 52 F.3d at 980). Such evidence may be considered "if

16   the court deems it helpful in determining 'the true meaning of language used in the patent

17   claims.'" *Id*. at 1318 (quoting *Markman*, 52 F.3d at 980). However, extrinsic evidence "is less

18   significant than the intrinsic record in determining the legally operative meaning of claim

19   language," and cannot "be used to change the meaning of claims in derogation of the indisputable

20   public records consisting of the claims, the specification and the prosecution history[.]" *Id*. at

21   1317, 1319 (internal quotations and citation omitted). "In sum, extrinsic evidence may be useful

22   to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless

23   considered in the context of the intrinsic evidence." *Id*. at 1319.

24   "[A] patent is invalid for indefiniteness if its claims, read in light of the specification

25   delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those

26   skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572

27   U.S. 898, 901 (2014); *see also* 35 U.S.C. § 112 ¶ 2 ("The specification shall conclude with one or

28   more claims particularly pointing out and distinctly claiming the subject matter which the

1    applicant regards as his invention.").  To meet this standard, "[t]he claims, when read in light of

2    the specification and the prosecution history, must provide objective boundaries for those of skill

3    in the art."  *Interval Licensing, LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).  General

4    principles of claim construction apply to allegations of indefiniteness.  *See Biosig Instruments,*

5    *Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377-78 (Fed. Cir. 2015); *see also Nautilus, Inc.*, 572 U.S. at

6    908 (definiteness is assessed based on patent specification and prosecution history, and measured

7    from viewpoint of person skilled in the art).  "The inquiry into how a person of ordinary skill in

8    the art understands a claim term provides an objective baseline from which to begin claim

9    interpretation."  *Phillips*, 415 F.3d at 1313.

10   ## III.    DISCUSSION

11   ### A.    Level of Ordinary Skill in the Art

12        The Court first addresses the level of ordinary skill in the relevant art(s) at the time of the

13   claimed invention, i.e., April 2003.  *See Phillips*, 415 F.3d at 1312-1313.  Here, 10Tales relies on

14   Dr. Rubin's opinions (*see* Dkt. No. 167-4), while TikTok relies on those of Dr. Bovik (*see* Dkt.

15   No. 185-3).  Although Drs. Rubin and Bovik disagree about whether the relevant field is

16   "computer networking" (*see* Dkt. No. 167-4 ¶ 35) or "digital media creation" (*see* Dkt. No. 185-3

17   ¶ 45), neither 10Tales nor TikTok contends that resolution of this dispute is necessary for purposes

18   of claim construction.  *See* Dkt. No. 167-4 ¶ 36; Dkt. No. 185-3 ¶ 44.  The Court adopts Dr.

19   Bovik's proposed standard for the level of ordinary skill in the art, with which Dr. Rubin does not

20   disagree:

21             at least a bachelor's degree, or an equivalent degree, in electrical
             engineering, computer science, or a related field, and 2-3 years'
22             experience researching, designing, developing, and/or testing
             systems for digital media creation and related firmware and
23             software, or equivalent experience.  Someone with less formal
             education but more experience or more formal education but less
24             experience could also have qualified as a [person of ordinary skill in
             the art].
25

26   Dkt. No. 185-3 ¶ 42; *see also* Dkt. No. 167-4 ¶ 36.[2]

27   _____

28   [2] In the IPR proceeding, the PTAB did not adopt a specific formulation regarding the level of
     ordinary skill in the art.  *See* Dkt. No. 167-7 at 11.

United States District Court
Northern District of California

1

**B.    Disputed Terms**

2     The parties dispute ten terms in claim 1 of the '030 patent, which are addressed separately

3  below.

4     **1.    "the system comprising . . . a computer-readable storage medium . . .
           wherein the computer-readable storage medium contains one or more
5           programming instructions for performing a method . . . the method
           comprising . . ."**
6

| 10Tales's Proposed Construction | TikTok's Proposed Construction |
|---|---|
| No construction necessary<br>Plain and ordinary meaning | Indefinite |

10     10Tales argues that this term requires no construction and should be afforded its ordinary

11  meaning, i.e., "a system that includes one or more servers and memory," which contains

12  programming instructions that, when executed, carry out the steps of the method recited in the

13  claim.  *See* Dkt. No. 167 at 10.

14     TikTok argues that claim 1 is indefinite under § 112 ¶ 2 because it is directed to two

15  separate classes of patentable subject matter, i.e., a system and a method.  *See* Dkt. No. 185 at 7.

16  Citing *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005) and *Rembrandt*

17  *Data Technologies, LP v. AOL, LLC*, 641 F.3d 1331 (Fed. Cir. 2011), TikTok also contends that

18  claim 1 is indefinite because it "requires the user to use the system, and is unclear whether

19  infringement requires making the system or using the system[.]"  *See* Dkt. No. 185 at 7-9.  The

20  Court disagrees.

21     "A single patent may include claims directed to one or more of the classes of patentable

22  subject matter, but no single claim may cover more than one subject matter class."

23  *Microprocessor Enhancement Corp. v. Texas Instruments, Inc.*, 520 F.3d 1367, 1374 (Fed. Cir.

24  2008) (citing *IPXL*, 430 F.3d at 1384).  A single claim that covers "'both an apparatus and a

25  method of use of that apparatus'" is indefinite "because 'it is unclear whether infringement . . .

26  occurs when one creates a[n infringing] system, or whether infringement occurs when the user

27  actually uses [the system in an infringing manner].'"  *UltimatePointer, L.L.C. v. Nintendo Co.,*

28  *Ltd.*, 816 F.3d 816, 826 (Fed. Cir. 2016) (quoting *IPXL*, 430 F.3d at 1384).  "Nonetheless,

United States District Court
Northern District of California

'apparatus claims are not necessarily indefinite for using functional language.'" *Id.* (quoting *Microprocessor Enhancement Corp.*, 520 F.3d at 1375); *see also MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1313 (Fed. Cir. 2017) (same). "If an apparatus claim 'is clearly limited to a[n apparatus] possessing the recited structure and *capable* of performing the recited functions,' then the claim is not invalid as indefinite." *UltimatePointer, LLC*, 816 F.3d at 826 (quoting *Microprocessor Enhancement Corp.*, 520 F.3d at 1375).

The claim at issue in *IPXL* was problematic because it purported to claim a system (i.e., one that could be infringed independent of any "use" of the system), but contained an element that required user activity. Thus, the Federal Circuit found the claim invalid because it was unclear whether infringement "occurs when one creates a system," or "when the user actually uses [the system]." *See IPXL*, 430 F.3d at 1383-84. Similarly, in *Rembrandt*, the claim at issue was found invalid because it recited several apparatus elements of a "data transmitting device" (i.e., "buffer means," "fractional encoding means," "second buffer means," and "trellis encoding means"), as well as one element concerning a method for using the claimed device (i.e., "transmitting the trellis encoded frames"). *Rembrandt*, 641 F.3d at 1339-40.

Unlike the claims in *IPXL* and *Rembrandt*, claim 1 of the '030 patent recites a system (i.e., "a server" and "a computer-readable storage medium operably connected") modified by functional terms describing the system's capabilities. Contrary to TikTok's contention, the claimed system does not require a user to do anything. Rather, the claimed "computer-readable medium" must contain "programming instructions" capable of performing the steps of the method described in the claim (i.e., "identifying," "creating," "presenting," "retrieving," "selecting," "monitoring" and "performing"). *See* '030 patent at 20:62-22:15. Such system claims with "permissible functional language used to describe the capabilities [of the claimed system]," rather than the activities of the user, are not invalid for indefiniteness. *MasterMine Software, Inc.*, 874 F.3d at 1315 (claim not invalid for indefiniteness where verbs in the claim "represent permissible functional language used to describe capabilities of the 'reporting module'"); *see also UltimatePointer, L.L.C.*, 816 F.3d at 827 (claim not invalid for indefiniteness because "the 'generating data' limitation reflects the capability of that structure rather than the activities of the user."). The fact that the specification

8

describes a method (not a system) as a preferred embodiment does not render claim 1 indefinite. *See Phillips*, 415 F.3d at 1323 ("For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

Accordingly, without adopting or endorsing 10Tales's proposed "ordinary meaning" of the term, the Court concludes that this claim term requires no construction.[3]

### 2.   "creating . . . . composite digital media display"

Claim 1 of the '030 patent contains two phrases pertaining to the creation of a "composite digital media display." *See* '030 patent at 21:9-10, 22:12-13.  The parties present the same arguments regarding the construction of both phrases.  Accordingly, the Court addresses them together here.

**"creating, from the first set of digital media assets, a first composite digital media display"**

| 10Tales's Proposed Construction | TikTok's Proposed Construction |
| --- | --- |
| No construction necessary<br>Plain and ordinary meaning | "combining two or more digital media assets from the first set of digital media assets to create a first composite digital media display with a narrative" |

**"creating, from the user specific digital media assets, a user specific composite digital media display"**

| 10Tales's Proposed Construction | TikTok's Proposed Construction |
| --- | --- |
| No construction necessary<br>Plain and ordinary meaning | "combining two or more digital media assets from the user specific digital media assets to create a user specific composite digital media display without destroying the flow of the narrative" |

10Tales argues that these terms require no construction and should be afforded their ordinary meaning.  TikTok argues that the "composite digital media display" must be construed to

---

[3] There was some discussion at the claim construction hearing about whether claim 1 "works." This argument was not briefed, and the Court does not consider it to be a question of claim construction that requires resolution at this time.

incorporate the requirement of a "narrative."

It is not readily apparent what ordinary meaning a person of skill in the art would attribute to this claim language.  Indeed, as is evident from the briefing and the arguments presented at the hearing, the parties have competing interpretations of "composite digital media display," and their experts, Drs. Bovik and Rubin, appear to agree that it is not a term of art.  *See* Dkt. No. 185-3 ¶ 97; Dkt. No. 185-8 at 11:18-23.  10Tales suggests that a "composite" is merely a "collection of digital media assets that will be presented to a user."  *See* Dkt. No. 167 at 11.  TikTok says that the claimed "composite" is the result of combining "two or more digital media assets" to create a display in the form of a "narrative."  *See* Dkt. No. 185 at 10-12.  TikTok further contends that "creating" a "composite" necessarily means "combining two or more digital assets."  *Id.*  To resolve this dispute, the Court looks to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Phillips*, 415 F.3d at 1314 (internal quotations and citation omitted).

TikTok correctly notes that the specification does not refer to "digital media display," "composite digital media display," or "composite."  These words appear only in the claims.  TikTok is also correct that the specification repeatedly refers to descriptions of "digital media narrative."  *See* '030 patent at 1:12-14, 1:66-2:2, 2:12-61, 3:7-11, 4:8-10; 4:24-28, 4:42-49, 5:19-22, 5:26-27, 5:39-40, 6:23-26, 8:63-67, 12:43-45, 13:22-27, 13:66-67, 16:59-62, 19:4-9, 19:31-33, 19:59-62, 20:1-3; *see also* Figs. 2, 3, 5A and 10.  TikTok contends that the term "composite digital media display" therefore must be construed to make clear that the claimed invention requires a "digital media narrative."  *See* Dkt. No. 185 at 11.  However, there is no question that claim 1 does not include the word "narrative."  TikTok has not identified any discussion in the remainder of the specification that would justify adding "narrative" as a requirement for the claim terms at issue.  *See Unwired Planet, LLC v. Apple Inc*., 829 F.3d 1353, 1359 (Fed. Cir. 2016) ("[W]e have repeatedly held that it is 'not enough that the only embodiments, or all of the embodiments, contain a particular limitation' to limit claims beyond their plain meaning.") (quoting *Thorner v.*

1    *Sony Computer Entm't Am., LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012); *see also GE Lighting*

2    *Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[I]t is improper to read

3    limitations from a preferred embodiment described in the specification—even if it is the only

4    embodiment—into the claims absent a clear indication in the intrinsic record that the patentee

5    intended the claims to be so limited.") (internal quotations and citation omitted); *Phillips*, 415 F.3d

6    at 1323 ("In particular, we have expressly rejected the contention that if a patent describes only a

7    single embodiment, the claims of the patent must be construed as being limited to that

8    embodiment.").

9         TikTok maintains that during the prosecution of the '030 patent, the applicant

10   distinguished these claims over U.S. Patent No. 6,357,042 ("Srinivasan") (*see* Dkt. No. 185-4),

11   and in doing so, limited the scope of claim 1 to "personalizing a digital media narrative in a

12   manner that does not destroy the flow of the 'narrative.'" *See* Dkt. No. 185 at 11.  TikTok

13   contends that the doctrine of prosecution disclaimer therefore precludes 10Tales from now

14   asserting an interpretation of claim 1 "that would allow destroying the flow of the narrative[.]"

15   *See id.*  "'The doctrine of prosecution disclaimer . . . preclud[es] patentees from recapturing

16   through claim interpretation specific meanings disclaimed during prosecution.'" *Mass. Inst. of*

17   *Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016) (quoting *Omega Eng'g, Inc. v.*

18   *Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003)).  For prosecution disclaimer to apply, "the

19   disavowal must be both clear and unmistakable." *Id.* (internal quotations and citation omitted).

20   "Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable

21   interpretations," the Federal Circuit has "declined to find prosecution disclaimer." *Id.* (internal

22   quotations and citation omitted).  Thus, the "'party seeking to invoke prosecution history

23   disclaimer bears the burden of proving the existence of a 'clear and unmistakable' disclaimer that

24   would have been evident to one skilled in the art.'" *Id.* (quoting *Trivascular, Inc. v. Samuels*, 812

25   F.3d 1056, 1063-64 (Fed. Cir. 2016)).

26        During the prosecution of the '030 patent, the patent examiner rejected claims 1-14 under

27   35 U.S.C. § 102(b) as anticipated by Srinivasan, noting that Srinivasan teaches "a method and

28   system of associating attributes with digital media assets[.]"  *See* Dkt. No. 185-5 at ECF 128

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1  (10Tales0000402).  On amendment, the applicant abandoned those claims, and presented new

2  claims 15 and 16 (now claims 1 and 2 of the '030 patent).  *See id*. at ECF 145-146

3  (10Tales0000419-420).  In distinguishing those new claims over Srinivasan, the prosecuting

4  attorney argued, among other things, that Srinivasan "teaches the selection of a particular analog

5  video stream at a branch point" (e.g., stopping a main video stream to broadcast an advertisement,

6  and continuing with the main video when the ad is finished).  *See id*. at ECF 142, 145

7  (10Tales0000416, 419); *see also* Dkt. No. 185-4 at 32:57-58.  TikTok notes that in distinguishing

8  over Srinivasan, the prosecuting attorney stated that the applicant's claimed substitution of digital

9  media assets "is performed in order to allow parts of the media display (e.g., background, timing,

10  audio) to be varied in a way that does not destroy the flow."  *See id*. at ECF 142

11  (10Tales0000416); Dkt. No. 185 at 11 & n.6.  That statement merely distinguishes over Srinivasan

12  regarding ways in which a "flow" may be interrupted; it is not a clear or unambiguous disclaimer

13  that the '030 patent's claimed "composite digital media display" must be a "narrative."  TikTok

14  has not met the high bar required to establish prosecution disclaimer.

15          Nor has TikTok identified a basis to substitute "combining" for "creating."  However, the

16  Court agrees that a "composite" requires a combination, as opposed to merely a collection or

17  listing of digital media assets.[4]  Such an interpretation of "composite" is supported by the

18  specification, which describes combining elements to create digital media assets.  *See* '030 patent

19  Fig. 2; 8:58-62; *see also id*. Fig. 3; 9:24-26.  That interpretation is also consistent with Dr. Bovik's

20  declaration in which he opines that "the plain and ordinary meaning of the term 'composite'

21  requires something made up of different parts or distinct components."  Dkt. No. 185-3 ¶ 108.  Dr.

22  Rubin offers no opinion to the contrary.

23          Accordingly, the Court construes the term "creating, from the first set of digital media

24

25  ────────────────

26  [4] 10Tales argues that TikTok's proposed construction requiring the first composite digital media
   display to contain two or more digital media assets would make dependent claim 2 broader than
   independent claim 1.  Specifically, 10Tales emphasizes that claim 2 provides that the "first set of
27  digital media assets includes *one or more* of a foreground image, a background image, or audio."
   *See* Dkt. No. 167 at 13 n.4 (quoting '030 patent at 22:16-18).  10Tales's argument fails to
   persuade.  The claim 2 language that 10Tales highlights simply describes a subset of what is
28  included in the "composite" of claim 1.

assets, a first composite digital media display" to mean *creating, from the first set of digital media assets, a first composite digital media display that combines two or more digital media assets.* The Court construes the term "creating, from the user specific digital media assets, a user specific composite digital media display" to mean *creating, from the user specific digital media assets, a user specific composite digital media display that combines two or more digital media assets.*

### 3. "display server"

The parties dispute the meaning of **"display server"**:

| 10Tales's Proposed Construction | TikTok's Proposed Construction |
|---|---|
| Server-side software that provides digital media content to a client | Indefinite |

They also dispute the meaning of the term **"presenting to the user via [a/the] display server,"** which appears in two places in claim 1:

| 10Tales's Proposed Construction | TikTok's Proposed Construction |
|---|---|
| A step carried out by software that begins transmitting digital media assets to a user | Indefinite based on "display server"—the phrase "presenting to the user" means "showing to the user" |

TikTok contends that "display server" is indefinite because it was not a term of art at the time of the claimed invention, and the term is not defined in the intrinsic or extrinsic evidence. Additionally, TikTok argues that it is not clear where the "display server" is located, what it does, or whether it is hardware or software. Alternatively, TikTok argues that if the Court disagrees that "display server" is indefinite, then the term "presenting to the user" should be construed to mean "showing to the user." Dkt. No. 185 at 12-13.

10Tales does not dispute that "display server" was not a term of art at the time of the claimed invention. *See* Dkt. No. 167 at 14. 10Tales nonetheless argues that a person of ordinary skill in the art would have understood the term "display server" to refer to software running on a server in a client-server model, and that the actual display of images, video, text and/or audio is

1    carried out by client-side software running on a user's device.[5]  10Tales further contends that

2    "presenting" is not synonymous with "showing."  *Id.* at 14-15.

3         A claim term is not indefinite simply because the claim language does not appear *ipsis*

4    *verbis* in the specification.  Rather, claim terms are to be given their ordinary and customary

5    meaning in view of the intrinsic evidence and, where appropriate, the extrinsic evidence, as

6    described in *Phillips*.  *See Phillips*, 415 F.3d at 1312, 1313; *see also Unwired Planet, LLC*, 829

7    F.3d at 1358 ("Claim terms are generally given their ordinary and customary meaning as

8    understood by a person of ordinary skill in the art when read in the context of the specification and

9    prosecution history.") (citing *Thorner*, 669 F.3d at 1365); *see also Williamson v. Citrix Online,*

10   *LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015) ("[I]t is the *claims,* not the written description, which

11   define the scope of the patent right.") (internal quotations and citation omitted).  And, as discussed

12   above, the standard for determining indefiniteness is "reasonable certainty," *i.e.*, "a patent is

13   invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and

14   the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the

15   scope of the invention."  *Nautilus, Inc.*, 572 U.S. at 901.

16        The absence of any reference to the term "display server" in the specification or any other

17   intrinsic evidence makes construction of this term challenging.  But while the specification does

18   not expressly refer to "display server," it does contain several descriptions of a "server" and its

19   functions and capabilities.  For example, the conceptual diagram in Figure 5A shows a server

20   (590) providing digital audio, digital video, background images, foreground images, text, and

21   branding graphics to the user (501).  *See* '030 patent, Fig. 5A.  The specification describes a

22   "server" (590), as shown in Figure 5A, that "may develop personalized digital media asset 212

23   from content 531 and the digital asset repository 541."  *Id.* at 11:65-67, 12:4-6.  In this

24   embodiment "a user 501 receives the assets that comprise the digital media asset 212 (Fig. 2)[.]"

25   _____

26   [5] 10Tales says it made a "scrivener's error" in its proposed construction (*see* Dkt. No. 149), and
     mistakenly said that "display server" is "server side software that provides digital media content to
27   a server" rather than "to a client."  *See* Dkt. No. 167 at 13 n.5.  The Court sees no reason to
     belabor this point, as the error is obvious in view of Dr. Rubin's declaration (*see* Dkt. No. 167-4
28   ¶ 52).  Moreover, TikTok had ample time to formulate its own claim construction positions and
     was not prejudiced by the error.

*Id*. at 11:67-12:2.  "In an alternate embodiment, the modified content is not stored and the personalized digital media asset is presented to user 501 via the server 590."  *Id*. at 12:7-10.  In describing an embodiment of the claimed invention, the specification also discusses "a central server" that "enables the user to receive enhanced digital medial assets and various narrative experiences . . . ."  *Id*. at 4:42-53.

Drs. Rubin and Bovik agree that servers were well known in the art at the time of claimed invention .  Indeed, both state that client-server technology was well known at that time.  *See generally* Dkt. No. 167-4 ¶¶ 39-41 (discussing state of the art and "client/server model"); Dkt. No. 185-3 ¶ 124 ("As of 2003, client-server technology was well established and known to a [person of ordinary skill in the art].").  As described by Dr. Rubin, "[a] typical workflow within the client/server model involves a client making a request to a server; a server receives the request and issues a response for that request.  The client relies on the resources included in server responses, which includes information, files, or even allocation of processing power."  Dkt. No. 167-4 ¶ 40.  "A specific example would be that an email client on the user machine works as a client, while a mail server from a public email service is a server.  In a network with client-server architecture, a single server is usually capable of handling multiple requests from multiple clients."  *Id*.  Dr. Bovik provides no opinion or evidence to the contrary.

Drs. Rubin and Bovik appear to disagree about whether "server" generally refers to hardware, software, or both.  Dr. Bovik opines that a person of ordinary skill in the art "would have recognized and understood the term 'server' to generally refer to hardware, *i.e.*, a large powerful networked computer that provides resources and services to other devices."  Dkt. No. 185-3 ¶ 124.  However, at least one of his cited definitions from the Microsoft Computer Dictionary, published in 2002, indicates that "server" may refer to either hardware or software, depending on the context.  *See* Dkt. No. 185-12 at ECF 19 (TT0007102) (defining "server" "[o]n a local area network" as "a computer," and "[o]n the Internet or other network" as "a computer or program").  That definition is consistent with Dr. Rubin's declaration in which he opines that "'[s]erver' is a context dependent term that can refer to hardware, software or both."  Dkt. No. 167-4 ¶ 25.v.  The Court finds nothing in the specification or the prosecution history that limits

"server" to hardware only or software only.

While TikTok argues that the claim language appears to distinguish "display server" from "a server" recited earlier in claim 1, that observation does little to illuminate the parties' dispute regarding the proper construction of "display server."[6]  The parties do not ask the Court to construe "a server," and "[a]s a general rule, the words 'a' or 'an' in a patent claim carry the meaning of 'one or more.'"  *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) (quotations and citation omitted); *see also Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) ("That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention.").  "'The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'"  *01 Communique Lab., Inc.*, 687 F.3d at 1297 (quoting *Baldwin Graphic Sys., Inc.*, 512 F.3d at 1342).  "The subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning."  *Id*. (quoting *Baldwin Graphic Sys., Inc.*, 512 F.3d at 1342).  "An exception to the general rule arises *only* 'where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule.'"  *Id.* at 1297 (quoting *Baldwin Graphic Sys., Inc.*, 512 F.3d at 1342-43).  Nothing in the claim language, specification, or prosecution history compels the conclusion that the applicant departed from the general rule for the article "a" used with "server" or "display server."

Based on the foregoing, the Court concludes that "display server" is a "server" in a conventional server-client model as understood by a person of ordinary skill in the art at the time of the invention, such that "server" can be either a computer program, a physical computer capable of running a computer program, or a physical computer running a computer program.  Further, in view of the disclosure in the specification regarding the functions and capabilities of the server embodiment described with reference to Figure 5A, the "display server" in claim 1 would be

---

[6] TikTok argues that there is no support in the specification for more than one "server."  *See* Dkt. No. 185 at 13 n.7*; see also* Dkt. No. 185-10 (Schulz Ex. I).  However, that argument appears directed to the adequacy of the written description, rather than claim construction.

understood, with reasonable certainty, as a server used in presenting the first and second composite digital media displays to the user. Although TikTok maintains that "presenting to the user" should be construed as "showing to the user," the Court finds no basis to limit the claim to any particular mode of presenting, such as visual presentation. The claim requires only that the "presenting" happen "via" a "display server," and the specification uses similar language to describe an embodiment. *See* '030 patent at 21:11, 22:14; *see also id*. at 12:7-10. Thus, "presenting" simply describes part of the typical interaction between a server and a client in a conventional client-server model that was well-established at the time of the clamed invention. *See, e.g.,* Dkt. No. 167-4 ¶ 40 ("A typical workflow within the client/server model involves a client making a request to a server; a server receives the request and issues a response for that request. The client relies on the resources included in server responses, which includes information, files, or even allocation of processing power."); Dkt. No. 185-3 ¶ 124 ("As of 2003, client-server technology was well established and known to a POSITA.").

### 4.    "user social network information"

The parties dispute the meaning of **"user social network information"**:

| 10Tales's Proposed Construction | TikTok's Proposed Construction |
|---|---|
| Information relating to a particular user's interaction within a networked community | Indefinite |

They also dispute the term **"retrieving user social network information from at least one source external to the presented first composite digital media display . . ."**:

| 10Tales's Proposed Construction | TikTok's Proposed Construction |
|---|---|
| A step carried out by software that retrieves social network information associated with a user from a source other than the first composite digital media display, where the social network information includes one or more user attributes, which include information relating to a particular user of the system's interaction within a networked community, e.g., a user affinity or relationship with another user | Indefinite |

17

1    10Tales acknowledges that "user social network information" requires construction, and

2    argues that the correct interpretation is captured by its proposed construction.  TikTok contends

3    that "user social network information" is indefinite.  The parties' dispute centers on two issues:

4    (1) the nature and scope of the "information" within the scope of the claim, and (2) the source of

5    that information.

6        As with other disputed claim terms, the term "user social network information" appears

7    only in the claims, and does not appear anywhere in the specification.  Additionally, "user social

8    network information" was not used in the original claims filed with 10Tales's non-provisional

9    application; it was added by amendment for the first time on November 25, 2009.  *See* Dkt. No.

10   167-3 at ECF 141, 145 (10Tales0000769, 773).  No party contends that "user social network

11   information" had a well-defined meaning known to those of skill in the art at the time of the

12   claimed invention in 2003.

13       The claim language itself is not sufficiently clear on its face to provide guidance to a

14   person of ordinary skill in the art as to the meaning of "user social network information."  The rest

15   of the claim limitation provides some helpful context to the extent it indicates that "user social

16   network information" is information that can be "retriev[ed]" from a source "external to the

17   presented first composite digital media display" and contains "one or more user attributes."[7]  *See*

18   '030 patent at 21:13-16.

19       TikTok's first argument, that "user social network information" is an indefinite term of

20   measure, is not persuasive.  That the *attributes* that comprise a user's profile may be subjective or

21   involve measurement, does not mean that the *claim* is properly characterized that way.  The term

22   "user social network information" is not like "unobtrusive manner" (a "purely subjective" term of

23   degree), which was found indefinite in *Interval Licensing, LLC*, 766 F.3d at 1371.  Nor is it like

24   "high quality of service connection" (also a subjective term of degree), which was nevertheless

25   found to have scope adequately defined by the specification in *Iridescent Networks, Inc. v. AT&T

26   Mobility, LLC*, 933 F.3d 1345, 1348 (Fed. Cir. 2019).  The term is also not like the "greater than

27

28   _____
     [7] The parties agree that "user attributes" does not require construction.

United States District Court
Northern District of California

1    or equal to" term of measure relating to ethylene polymer compositions at issue in *Dow Chem. Co.*

2    *v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 631-35 (Fed. Cir. 2015).  TikTok nonetheless

3    argues that there is some definitional "uncertainty" regarding "user social network information,"

4    *see Interval Licensing, LLC*, 766 F.3d at 1374, and correctly notes that it is not sufficient that a

5    court can ascribe some meaning to a patent's claims, *id*. at 1371 (citing *Nautilus*, 572 U.S. at 911;

6    *Halliburton Energy Servs., Inc. v. M–I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008)).  Under

7    *Nautilus*, the key determination is whether the claim, read in light of the specification and

8    prosecution history, provides "objective boundaries" that define the scope of the claim with

9    "reasonable certainty."  *See Interval Licensing, LLC*, 766 F.3d at 1371 (citing *Nautilus*, 572 U.S.

10   at 911 & n.8); *see also Nautilus*, 572 U.S. at 901.

11          Following *Phillips*, the Court looks to the specification and then to the prosecution history

12   of the '030 patent, in addition to the claim language itself.  *See Phillips*, 415 F.3d at 1313, 1315-

13   17.  For the reasons discussed below, the intrinsic evidence provides sufficient guidance to permit

14   a person of ordinary skill in the art to understand the scope of the term "user social network

15   information" with reasonable certainty.

16          Although the '030 patent specification does not use the term "social network," it does

17   provide some guidance regarding how that term would be understood by a person of skill in the

18   art.  *See, e.g., Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1288 (Fed. Cir. 2023) (term

19   "elongate member" not indefinite, even though specification did not use the term "elongate

20   member" but did use the term "elongate shape"); *Biosig Instruments, Inc.*, 783 F.3d at 1382 (the

21   term "spaced relationship" is not indefinite, even though the specification did not define that

22   term).  For example, the '030 patent specification states that a user may participate in "an online

23   community" that provides the "user with the ability to interact with other users."  '030 patent at

24   12:11-13; Fig. 5A.  In one embodiment, the "online community" includes the ability to share an

25   experience, "thus creating new affinities for the content" of that experience.  *Id*. at 12:13-16.

26   Notably, the specification discloses that in one embodiment, "[t]he user 501 may participate in an

27   online community system 521 in which the server 590 sends the user ID 520 to the online

28   community system 521 and receives lists of community user attributes 515 and active vs. inactive

United States District Court
Northern District of California

United States District Court
Northern District of California

status 517." *Id*. at 12:22-26.  Alternatively, Figure 5B shows databases that can be used in the "creation of the personalized digital media asset." *Id*. at 12:48-49.  The databases include "a group and social dynamics database" that "may permit the user to interact with other users of the digital media asset to determine the dynamics between that user and the group." *Id*. at 12:47-58; Fig. 5B.  Another part of the specification discusses "exemplary social elements and their components," which include:  "the groups 802 that the user is affiliated with", "a social perception identification framework 804, such as a user's on-line personality or alter ego," "social personas 808, which are how people perceive that user," "a user's social affinities 806," "the level of involvement 810 that the user has with other individuals," "the relationship 812 the user has with other individuals, the modes of interaction 814 or how the user communicates and interacts with other individuals," "the ability of the user to be apt or, alternatively inept in performing functions, such as social interaction 816," "the attitudes 818 the user has," and "internal narrative perception identification frameworks 820." *Id*. at 13:50-62; *see also* Fig. 8 (using the term "social" as a label in different parts of illustration of "exemplary components of the social element").

Further guidance regarding "social network" is found in the statements made during the prosecution of the '030 patent, including those made by the applicant and the examiner when new claims 15 and 16 (which became claims 1 and 2) were added.  *See Phillips*, 415 F.3d at 1317 (prosecution history "can often inform the meaning of the claim language . . .."); *see also Iridescent Networks, Inc.*, 933 F.3d at 1352-53 ("'[a]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented.'") (quoting *Fenner Invs., Ltd.*, 778 F.3d at 1323).  The prosecution history reveals that the applicant added these claims after the examiner rejected the prior claims as anticipated by Srinivasan.  *See* Dkt. No. 167-3 at ECF 141-146 (10Tales0000769-774).  The applicant explained that "newly presented claim 15 is not anticipated by Srinivasan under 35 U.S.C. §102(b) because, among other things, Srinivasan does not utilize social network information obtained from a source external to the presentation (e.g. video display of Srinivasan)," citing as support paragraph 0089 in the provisional application, which corresponds to the '030 patent at 12:47-62, quoted above.  *See* Dkt.

No. 167-3 at ECF 29, 142 (10Tales0000657, 770).  In the notice of allowability issued on June 4, 2014, the examiner relied on the "retrieving" limitation and the inventor's explanation of it to distinguish the claimed invention from the prior art.  Although the examiner did not expressly discuss the meaning of "social network" or "user social network information," his statement of reasons for allowance indicates that he understood the patentee's use of "social network," and viewed "a plurality of bulletin boards" described in *Herz* as a "social network" and a "television electronic program guide" as "not a social network":

> 4.  The following is an examiner's statement of reasons for allowance: the closest prior art, Srinivasan *et al*., does not teach or suggest, **retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes**.  Herz (US 7,483,871 B2, claims 17 and 21) teaches this limitation,[] but the prior art does not teach or suggest adding this teaching from Herz to the teachings of Srinivasan *et al*.  Srinivasan *et al*. gets user attribute information by asking the users.  The prior art does not teach or suggest that the benefits of going to social networks to get user attribute information would outweigh the costs.
>
> Footnote text: Herz teaches the generation of a *user target profile interest summary* where a *user profile* is a collection of the user's **attributes** (Herz, col. 4, line 51, to col. 5, line 8, and para. [0052] and [0098] of the instant specification.  In Herz, the social network is "a plurality of bulletin boards".
>
> * * *
>
> 7. Ward, Ill, *et al*. (US 8,635,649 B2) stands out for providing details of a mechanism for determining user profiles and attributes.  However, Ward's mechanism is a television electronic program guide, not a social network.  In the examiner's opinion, if one of ordinary skill in the art at the time of the invention, wanted to improve Srinivasan *et al*., he or she would more likely have done so by using an EPG, as taught by Ward, Ill, *et al*., than by using social networks, as taught by Herz.

Dkt. No. 167-3 at ECF 220-221 (10Tales0000848-49).

Based on the foregoing, the Court construes "user social network information" to mean *information derived from a user's interactions in an online community.*[8]

---

[8] TikTok contends that the '030 patent does not describe any specific method for analyzing, determining, or measuring "user social network information."  *See* Dkt. No. 185 at 18.  That argument appears to be directed to written description or enablement.  The Court does not consider this to be an issue of claim construction that requires resolution at this time.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    This construction is also consistent with the extrinsic evidence.  Dr. Rubin opines that in

2    light of the '030 patent specification, a person of ordinary skill in the art would understand the

3    term "user social network information" to refer to information based on a user's participation in an

4    online community.  *See* Dkt. No. 167-4 ¶¶ 92-93.  And in a declaration submitted in support of

5    TikTok's IPR petition, Dr. Kevin Almeroth similarly opined that, although the '030 patent

6    specification does not mention a "social network," the concept of an "online community" was

7    known in the art at the time of the claimed invention and that "the '030 patent acknowledges

8    social elements of affinities, which are user attributes, including the user's interaction with others

9    was 'understood by those skilled in the art.'"  *See* Dkt. No. 167-5 ¶¶ 102, 106-107 (citing '030

10   patent at 13:11-36, 50-62).  While Dr. Bovik opines that "user social network information" was

11   not a term of art, he acknowledges that electronic social networks existed, albeit in their infancy,

12   at the time of the claimed invention.  *See* Dkt. No. 185-3 ¶ 160.

13   With respect to the limitation in claim 1 for "retrieving user social network information

14   from at least one source external to the presented first composite digital media display . . .," the

15   parties' main point of contention is the meaning of "source external."  As noted above, the parties

16   were given an opportunity to submit supplemental briefing on this point.  Dkt. No. 196.  10Tales

17   maintains that "source external" refers to a source "other than" the first composite digital media

18   display.  Dkt. No. 199.  TikTok argues that the "retrieving" limitation is indefinite because it is

19   unclear what "source[s]" of "user social network information" are included in the scope of the

20   claim.  Dkt. No. 200.

21   The Court's construction of the term "user social network information" addresses the *kind*

22   of information being retrieved, i.e., "information derived from a user's interactions in an online

23   community."  In context, the plain and ordinary meaning of "source external" simply means that

24   the claimed information is retrieved from a source is other than the presented first composite

25   display.  Accordingly, the Court construes the term "retrieving user social network information

26   from at least one source external to the presented first composite digital media display . . ." to

27   mean *retrieving user social network information from at least one source other than the presented*

28   *first composite digital display*.

5.    **"monitoring the first composite digital media display for the presence of a trigger"**

| 10Tales's Proposed Construction | TikTok's Proposed Construction |
|---|---|
| A step carried out by software that monitors for an opportunity to personalize the display | monitoring the first composite digital media display for the presence of a trigger within the narrative |

The parties agree that the "monitoring" term requires construction.  10Tales proposes a construction that substantially rewrites the claim language and purports to define "trigger." TikTok's proposed construction seeks to incorporate a "narrative" requirement into the claim language and does not define "trigger."

The term "trigger" appears only in the claim language, and does not appear anywhere in the specification.  The specification does discuss "trigger points," which are defined as "occurrences or time points within a story or narrative content that may cause the recipient (viewer, reader, or listener) to take a particular interpretation at one or more levels or that may affect the user's emotional state."  '030 patent at 7:1-5.  The specification also defines "personalization trigger points" as "those trigger points that allow for modification of the story or narrative content in support of customization of the content to match the internal narrative perception framework and appropriately influence the user."  *Id*. at 7:5-9; *see also id*. at 4:24-28, 4:35-41, 9:59-61, 10:1-15, 10:23-25, 10:34-43, 10:47-50, 10:59-11:10, 12:63-67, 14:27-31, 16:7-10, 16:34-37, 17:4-7, 17:35-41, 17:54-57, 17:67-18-:1, Fig. 4, Fig. 5B.

For the reasons discussed above, TikTok has not provided a basis to read a requirement for a "narrative" into the claim language, or to find that the claim was so limited through prosecution disclaimer.  *See Mass. Inst. of Tech*, 839 F.3d at 1119; *Unwired Planet, LLC,* 829 F.3d at 1359; *Thorner*, 669 F.3d at 1366.

While the "wherein" clause of the "monitoring" claim limitation seems to describe the only meaningful function of the trigger and introduces some redundancy in defining the term, in context, the entire phrase—"monitoring the first composite digital media display for the presence of a trigger, wherein the trigger indicates a personalization opportunity in the first set of digital

United States District Court
Northern District of California

media assets"—indicates that "trigger" is an indication of a personalization opportunity in the first composite digital display. "Trigger" must be construed as something in the display itself, given the plain meaning of the phrase "monitoring . . . the display for the presence of . . . ." The Court finds no support for 10Tales's argument that the "trigger" need not be present in the first composite digital media display. That proposed construction is inconsistent with the claim language. Moreover, the Court notes that there is no embodiment in the specification where the trigger/trigger point is outside of the display.

Accordingly, the Court construes "trigger" to mean: *an indication of a personalization opportunity*. The Court construes, the entire phrase "monitoring the first composite digital media display for the presence of a trigger" to mean: *monitoring the first composite digital media display for the presence in the display of an indication of a personalization opportunity*.

### 6. "performing a rule based substitution of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets"

| 10Tales's Proposed Construction | TikTok's Proposed Construction |
| --- | --- |
| A step carried out by software that applies a rule to include one or more of the digital media assets from the second set of digital media assets, which is based on the user attributes included in the user's social network information | Indefinite, or alternatively: performing a replacement based on a rule of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets |

10Tales argues that the claim language "makes clear that the 'second set of digital media assets' is the set that is selected using the social network information to further personalize the content being sent to the user." Dkt. No. 167 at 22. TikTok contends that this phrase is indefinite, arguing that "rule based substitution" is not a term of art and is not defined by intrinsic or extrinsic evidence. Dkt. No. 185 at 22.

The Court finds that this claim limitation is not indefinite, and that its meaning is clear from the claim language itself. Reading this claim limitation in the context of the rest of claim 1, it is clear that there is a "first set of digital media assets," then a "selecting" of a "second set of digital media assets" "based on the user attributes in the [user] social network information"

United States District Court
Northern District of California

United States District Court
Northern District of California

1    retrieved in an earlier step, and then once a "trigger" is detected in the first composite digital

2    media display, there is a "performing a rule based substitution of one or more" assets from the first

3    set with one or more assets from the second set, to "create a user specific set of digital media

4    assets." *See* '030 patent at 21:7-22:11.  In this context, the term "rule based" refers to a

5    substitution that happens by application of a rule, rather than on the basis of some discretionary or

6    subjective determination.[9]

7          The Court finds no basis for 10Tales's proposed construction that "substitution" means

8    "include."  10Tales correctly notes that the specification states that a "script may cause the

9    insertion and/or replacement of" certain assets "in the digital presentation," *see* '030 patent at

10   10:16-22, and describes at least one "insertion" embodiment, *see id.* at 10:23-31.  But the patent

11   claims a "substitution of one or more . . . assets . . . with one or more assets . . . ."  *See id.* at 22:7-

12   10.  Claim 1 does not use the term "insertion," and nothing in the claim language or the remainder

13   of the specification suggests that "substitution" encompasses insertion alone.

14         Based on the foregoing, the Court finds that no construction is required.

15         7.    **"the second composite digital media display"**

16

17

| **10Tales's Proposed Construction** | **TikTok's Proposed Construction** |
|---|---|
| No construction necessary<br>Plain and ordinary meaning | Indefinite |

18

19

20         10Tales argues that this term requires no construction and should be afforded its ordinary

21   meaning.  TikTok contends that this term is indefinite, arguing that it could refer to a "second

22   composite digital media display" or to "a user specific composite digital media display" recited

23   earlier in the claim.  *See* '030 patent at 22:11, 14-15.

24         The Court finds that this claim term is not indefinite.  Nor does it lack antecedent basis.

25   Read in context, the plain meaning of "the second composite digital media display" is "the user

26

27   ───────────────
     [9] Drs. Rubin and Bovik do not agree on what "rule based" means.  *See* Dkt. No. 167-4 ¶¶ 96-100;
28   Dkt. No. 185-3 ¶¶ 196, 208.  Neither 10Tales nor TikTok has proposed a construction that
     resolves this particular disagreement.

specific composite digital media display" in the preceding limitation, which is created from the

"user specific digital media assets."

**IT IS SO ORDERED.**

Dated: August 14, 2023

VIRGINIA K. DEMARCHI
United States Magistrate Judge

United States District Court
Northern District of California